IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
On-Briefs October 31, 2002

**STATE OF TENNESSEE, DEPARTMENT OF  CHILDREN'S SERVICES, IN THE MATTER OF:  T.K.C., T.J.C., C.B.W., T.S.W.,and T.S.C., Children Under 18 years of age**

**A Direct Appeal from the Juvenile Court for Shelby County**
**No. J6524      The Honorable Harold Horne, Special Judge**

_____

**No. W2001-03017-COA-R3-JV - Filed December 30, 2002**

_____

This is a termination of parental rights case.  The mother, Tonza Williams, appeals the order of the juvenile court terminating parental rights to her five children.  For the reasons hereinafter stated, we affirm the juvenile court order.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Joree G. Brownlow, Cordova, For Appellant, Tonza Williams Crawford

Paul G. Summers, Attorney General, Elizabeth C. Driver, Assistant Attorney General, For Appellee, State of Tennessee, Department of Children's Services

**OPINION**

This is a termination of parental rights case.  On May 22, 1998, Tonza Williams' ("Ms. Williams," or "Appellant") four children, T.S.C., T.K.C., T.J.C., and C.B.W.,[1] were removed from her custody based upon allegations that she had used an extension cord to spank one of the children. At that time, custody was given to Ms. Williams' brother and the Department of Childrens' Services ("DCS," or "Appellee") was ordered to supervise the case.  On the petition of Ms. Williams and the

---

[1]  T.S.C. was born on 9/27/91.  T.K.C. and T.J.C. were born on 6/05/95.  C.B.W. was born on 5/15/98.  Mr. Barry Williams and Mr. Rudolph Cooper are believed to be the fathers of C.B.W. and T.S.W. respectively.  Neither Mr. Williams nor Mr. Cooper made an appearance in this matter and both were found to have abandoned their children under T.C.A. §§ 36-1-113 (g)(1) and 36-1-102 (1)(A).  Mr. Hugh Crawford is the father of T.J.C., T.S.C. and T.K.C..  At the time of the hearing, Mr. Crawford was incarcerated for aggravated assault.  Prior to the hearing, he had neither had contact with nor provided support for his children.

recommendation of DCS, the children were returned to Ms. Williams' custody on May 21, 1999, but remained under DCS' protective supervision. The report filed with the court by DCS provided that, as of May 21, 1999, Ms. Williams had completed a parenting class and that her parenting skills had improved to the point that the children could be returned to her custody. On May 31, 1999, Ms. Williams gave birth to her fifth child, T.S.W.. All five of the children were returned to DCS custody on March 1, 2000 after police responded to a call and found two-year-old C.BW. with two black eyes, and a hemorrhage in the right eye.

On March 22, 2000, DCS created a permanency plan ("Plans") for each child. The Plans for each child were identical in terms of Ms. Williams' responsibilities under them. Ms. Williams' responsibilities were to: (1) contact DCS and request phone contact and visits; (2) obtain a psychological evaluation and follow all recommendations; (3) gain insight into appropriate disciple for children; (4) acquire positive anger management, self-control, and coping skills; (5) participate in an intensive program of drug and alcohol classes; and (6) submit to random drug screens. The Plans were signed by Ms. Williams on April 18, 2000.

Ms. Williams began visitation with her children after they were ordered into State custody.[2] However, from June 28, 2000 until December 21, 2000, she made no effort to contact DCS or her children. On December 22, 2000, Ms. Williams contacted DCS to arrange a visit with her children. She was allowed that visit on January 11, 2001. Additionally, the Plans were revised and signed by Ms. Williams on January 18, 2001 but the responsibilities of Ms. Williams remained unchanged except that the requirement for psychological evaluation was omitted in the revised Plans.[3] The goal of both the March 2000 Plans and the January 2001 Plans was adoption.[4]

On February 22, 2001, a Petition for Termination of Parental Rights (the "Petition") was filed. The Petition named Tonza (Williams) Crawford, Hugh Crawford, Barry Cox, and Rudolph Cooper as Respondents.

An Order for Continuance was entered on May 2, 2001[5] and an Order of Publication was subsequently filed in order to notify the putative fathers. A guardian ad litem was appointed to

---

[2] Although the children were removed from Ms. Williams' home in March of 2000, an order was not entered until April 14, 2000.

[3] Only one of the revised Plans, dated January 18, 2001 was entered into the record. That is the Plan of T.J.C.. Counsel for both sides stipulated that the Plans for the other children were identical to that admitted into evidence.

[4] On or about July 6, 2001, the Plans were revised again and a dual goal of adoption and reunification was listed. The court, however, did not ratify these Plans because of the dual goal. According to Ms. Miller's testimony, the dual goal was established because of DCS' belief that Ms. Williams "had made so much progress" and because DCS wished to "continue working with the mother to see if she would progress [further]."

[5] According to Ms. Miller's testimony, DCS filed this petition for continuance in order to "give the mother additional time [in order for her to] get her act together."

represent the children on May 9, 2001. The guardian ad litem filed her Answer on July 10, 2001. The Answer of the Guardian Ad Litem reads in pertinent part as follows:

> 1. All of the children are thriving in foster care. Although [T.S.C, T.J.C., and T.K.C.] have suffered from some disciplinary problems which may have resulted from living with their mother, they are all recovering and, for the most part, well adjusted to their present homes.
>
> 2. The only child who exhibited concern about having the family reunited was [T.S.C.], who cried when she spoke to your Guardian ad litem and stated that she wanted her family back together...
>
> 3. [There is some indication] that the children's behavior worsens after exposure to their mother. Apparently, her influence is disruptive to their recovery. [T.J.C. and T.K.C.'s] grades suffer and they have behavioral problems; [T.S.C.] has similar reactions...
>
> *                           *                           *
>
> 5. There is no one in the mother's family who is able to provide a home for the children.
>
> *                           *                           *
>
> 7. ...[Ms. Williams] stated that she wanted her children with her, and that she is attending rehab sessions everyday. She states that she has been drug free for seven months and that her past drug problems and abuse of her children are related to depression. She did not deny abuse and stated that depression was no excuse for abusing children. She does not currently have a job, although she stated that she did apply at Wonder Bread. Her past job experience has been in cashiering and warehousing. She is presently living with her mother. She appears to love her children and really be sorry for what has happened to her family. She admitted that the stress of trying to care for five children may have contributed to her substance abuse and loss of patience which resulted in violence to her children.
>
> [Ms. Williams] has no support system of friends other than those at the rehab center. She does not appear to have awareness of how to care for children and did not interact with her children in the manner one would expect for a mother who had not seen her children in months...

The Findings and Recommendation of Referee were filed on July 31, 2001 and the recommendation was for the children to remain in foster care. On October 5, 2001, the children's paternal aunt, Rosetta Watkins[6] filed a Petition to Modify Order, seeking custody and guardianship of [T.S.C., T.J.C., and T.K.C.]. On October 9, 2001, the guardian ad litem filed a Supplemental Answer, which stated that:

> ...Ms. Watkins lives in a three bedroom home and advises that she is unable to care for the children without the help of state funds. Your Guardian does not believe that full disclosure of the children's behavioral problems has been made to Ms. Watkins and that granting custody to her without additional investigation would be premature...
>
> *                                    *                                    *
>
> [Ms. Williams] is now employed at Saint Frances [sic] Hospital and will be moving into a new two bedroom apartment with her mother and wants custody of [C.B.W. and T.S.W.]. Your Guardian notes that [Ms. Williams] refused to go into the program at Moriah House because she did not want to give up her freedom...

This case was set for hearing on October 11, 2001. On that date, the Court allowed an Amended Petition for Termination of Parental Rights (the "Amended Petition") to be filed. The Amended Petition added the following ground for termination of Ms. Williams' parental rights:

> 18. Pursuant to T.C.A. § 36-1-113(g)(4) the mother has committed severe child abuse as defined in T.C.A. § 37-1-102, whether by prior order of the court or to be found by this Court when hearing the petition for termination of parental rights. Said abuse was committed against a child who is subject of this petition and/or against a sibling or half-sibling of such child.

This matter was heard by the Juvenile Court, Shelby County, between October 16, 2001 and October 17, 2001.

Concerning requests for visitation, Ms. Senetra Miller, the DCS case manager assigned to this matter, testified that Ms. Williams partially complied with the requirements of the Plans. Beginning in March of 2000 and continuing through July 2000, Ms. Williams made several visits to DCS and was also in contact with them by phone. According to Ms. Miller's testimony, the dates of these visits were April 18, 2000, May 15, 2000, May 31, 2000, June 14, 2000 and June 28, 2000. Ms. Williams failed to attend scheduled visits on July 18, 2000 and July 25, 2000. From that point,

---

[6] Rosetta Watkins is the sister of Hugh Crawford.

Ms. Williams made no further contact with DCS or the children until December 22, 2000. A visit was arranged for January 11, 2001. From January 11, 2001, Ms. Williams visited on February 8, 2001, March 21, 2001, and April 28, 2001. Ms. Williams cancelled May 24, 2001 and May 30, 2001 visits because of conflicts with her work schedule. After working out a schedule compliant with her work hours, Ms. Williams resumed visitation on June 14, 2001. A visit scheduled for June 21, 2001 was cancelled because Ms. Williams was incarcerated.[7] On July 6, 2001, July 12, 2001, and July 17, 2001 visits occurred. Ms. Williams visited once in August on the 31st and also on September 7, 14, and 28 2001. Ms. Williams cancelled a visit scheduled for September 28, 2001 and the record reflects no more visits prior to the October hearing.

Turning to the requirement that Ms. Williams obtain a psychological evaluation and adhere to any recommendations made during the course of that evaluation, the record indicates that Ms. Williams was referred by DCS to LeBonheur Center for Children and Parents ("CCP"). On June 21, 2000, Ms. Williams met with a case worker at CCP, at which time a physical examination of all of the children was conducted. Ms. Williams was scheduled for a second meeting with CCP, which was to include a psychological evaluation. Ms. Williams failed to keep this second appointment. Ms. Williams also failed to keep a rescheduled appointment. On July 26, 2000, the CCP case worker and child psychologist assigned to Ms. Williams' sent their findings to DCS. In pertinent part, this report reads as follows:

> During the initial interview [June 21, 2000] Ms. Williams initially denied that she had injured [C.B.W.], maintaining that he fell down some steps, thus injuring both eyes. This report conflicted with the reports of her older three children, who all reported their mother had caused the injuries to [C.B.W.]. Throughout the interview, Ms. Williams minimized and rationalized her abusive behavior toward her children, Ms. Williams blaming her drug use, her depression, and her children's behavior for her abuse....
>
> *                                    *                                    *
>
> [Ms. Williams has] little knowledge of the emotional needs of her children and [uses] abusive methods for punishment. Ms. Williams obviously has very poor anger management skills. Despite her past involvement in a drug treatment program, and despite her acknowledging that her alcohol and crack use present a significant problem, she continues to use both. While Ms. Williams maintained, during the Initial Interview, that she would do whatever was necessary to regain custody of her children, she did not complete this

---

[7] Ms. Williams was incarcerated after being arrested for contempt of court for failing to appear for her court hearing on charges of public intoxication and possession of drug paraphernalia. She was released after being given a sentence of time served. The date of the arrest is not in record.

evaluation, Ms. Williams missing two appointments for her psychological evaluation.

After Ms. Williams instigated contact with DCS on December 22, 2000, Ms. Williams was re-referred to CCP for completion of her psychological evaluation. This re-referral was made on or about July 30, 2001. On September 28, Ms. Williams met with a case worker at CCP and the following report was sent to DCS that same day. In pertinent part, the report reads as follows:

> Summary and Impressions:
>
> Ms. Williams appears to be genuine in her intentions to maintain a sober, drug-free lifestyle. However, she has yet to establish a stable home in which she can rear her children and a stable source of income, despite her reported ten months of sobriety. She does appear to be taking steps toward those goals, but her two younger children have already spent the majority of their lives in foster care. Throughout this interview, Ms. Williams expressed concerns about her ability to have the patience needed to parent five children. She also spoke of her tendency to "snap" at times. While she seems to have the desire to be a better mother, she seems to be expressing reservations about her ability to manage the stress of caring for her children. A further concern is that there is still a degree of role reversal in Ms. Williams' view of her children. She speaks of how her children meet her needs and the effect their removal had on her, rather than of how she can meet their needs and the impact of her abuse on them. The severity of the abuse she inflicted in the past remains another reason for concern.
>
> A major factor that still needs to be considered is the degree of attachment each of the children has to their mother. At the time of the previous evaluation, in June 2000, only [T.S.C.] expressed any strong attachment to Ms. Williams or any desire to eventually be returned to [the] mother's custody....

Ms. Miller testifies that the September 28, 2001 meeting with CCP resulted in a "social history" and that Ms. Williams was required to go back for a second appointment to complete the psychological evaluation. Ms. Miller testified that Ms. Williams failed to return to CCP for that second appointment on October 5, 2001, which resulted in her noncompliance with this requirement of the Plans.[8] However, as noted above, only the original Plans of March 2000 contained a requirement

---

[8] Ms. Williams contacted CCP to cancel the October 5, 2001 because she had a conflict with her work schedule. Ms. Williams also cancelled a rescheduled appointment on October 10, 2001.

for psychological evaluation. That requirement was dropped from the January 18, 2001 Plans, which were in place at the time Ms. Williams missed her appointments with CCP.

Under the Plans, Ms. Williams was also required to gain insight into proper discipline for her children. Ms. Williams was also scheduled to attend classes at the Exchange Club from March 28 until May 16, 2001. According to a report from the Exchange Club, dated April 27, 2001, Ms. Williams had "attended 5 out of 8 classes and should complete on 5/16/01 if she continues to have good attendance and passes the final exam. Ms. Williams has been actively participating in her classes so far."

According to Ms. Miller's testimony, Ms. Williams never participated in any educational workshops concerning anger management, self-control, or coping skills.

The record reflects that, when Ms. Williams made contact with DCS in December 2000, she had begun an alcohol recovery program of her own volition. Specifically, Ms. Williams was attending Freedom Road, a type of AA program. Ms. Williams' sponsor at Freedom Road, Marie Williams (no relation) testified in pertinent part as follows:

> A: ...when I [Marie Williams] first met [Tonza Williams] upon her first main days, it was required that she attend 90 meetings in 90 days. I think Tonza attended probably 180 within the first 90 days.[9]
>
> Q: She [Tonza Williams] was serious?
>
> *                              *                              *
>
> Q: Do you believe that Tonza's recovery is the most important thing in her life today?
>
> A: Exactly.

On March 8, 2001, Ms. Williams was enrolled, by referral from DCS, in the Memphis Alcohol and Drug Council Program. At that time, Ms. Williams signed a Memphis Alcohol and Drug Council form, which outlined the rules for attendance and Ms. Williams' rights as a client of the program. The form also indicated that Ms. Williams could be discharged for noncompliance for three absences. Attached to this form was a Michigan Alcoholism Screening Test, which Ms. Williams

---

[9] The attendance forms for Freedom Road indicate that Ms. Williams did not attend meetings on January 5, 6, 8, 13, 14, 17, 21, and 26 of 2001. When asked why there are no signatures for these dates, Marie Williams stated that Ms. Williams sometimes forgot her forms.

completed and a Drug Abuse Screening Test, which was also completed.[10] On June 25, 2001, Ms. Miller received a progress letter from the Memphis Alcohol and Drug Council, which stated in pertinent part that:

> [Ms. Williams] has attended twelve of her thirteen groups and is scheduled for her final drug screen and completion on Wednesday, June 27th. She is actively participating in group activities and is showing insight into resolving her conflicts as they present without the benefit of alcohol and/or other drugs. She has shared her experiences with using her conflict/resolution tools and is effectively using her "9 Second Timeout" technique to allow herself time to process before taking action.

Ms. Williams' record indicates that she was fairly steady in her attendance at the Memphis Alcohol and Drug Council meetings.[11] On August 1, 2001, Ms. Williams received a Certificate of Completion from the Memphis Alcohol and Drug Council for Low Intensive Outpatient Level II participation.

When asked at the hearing whether she was continuing to attend AA meetings, Ms. Williams testified as follows:

> Q: Let's talk about since you started with St. Francis. How many AA meetings do you go to a week?
>
> A: The last meeting that I went [to] was last Friday, noon. Prior to that I had been at work?
>
> Q: So you haven't been to an AA Meeting since you started–you have only been to one since you've started working at St. Francis?
>
> A: Last Friday I went to a noon meeting.
>
> Q: That was it?

---

[10] Both tests consist of a series of yes or no questions. Ms. Williams score was 33 on the Michigan Alcoholism Screening Test and 13 on the Drug Screening Test.

[11] Ms. Williams' individual sign-in sheet for 2001 shows that she attended meetings on March 14, 21, 28, April 4, 11, 18. On April 25, she had an unexcused absence. She resumed attendance on May 2, 9, 16, 23 and had a second unexcused absence on May 30. She attended on June 6 and 13 then failed to attend on June 20, 27 and July 4. The sign in sheet notes that Ms. Williams had a work schedule conflict on June 20 and 27 (although these absences are listed as unexcused) and was excused for the July 4 holiday. On July 11, Ms. Williams also had an unexcused absence, which was listed as a work conflict. Ms. Williams attended on July 24.

A: Uh-huh, because I have been working. I can't work and make meetings at the same time.

Q: Okay.

A: Because the first meeting is at 8:00 in the morning, then noon, and then 7:00 at night and I'm at work.

THE COURT: At 8:00 in the morning you're at work?

THE WITNESS: No, but just as soon as I can get my, balance myself out, I will start back picking up going to my meetings, because I don't want to let my meetings go, you know. My meetings are very important to me.

Q: [by Ms. Hardaway] But it's your testimony that you don't feel you can do both at the same time; is that right?

A: Yes, I did say that.


According to the record, Ms. Williams received four drug screens from Memphis Alcohol and Drug Council. No drug screens were requested prior to January 23, 2001. The first drug screen was on January 23, 2001. Two of the screens were in June 2001 and the third was on August 7, 2001. All four screens were negative.

At the time of the hearing, Ms. Williams was residing with her mother, Teresa Williams. Ms. Williams is on the lease with her mother at Cleaborn Homes, a public housing complex. Their apartment at Cleaborn Homes is only one bedroom; however, Ms. Williams testified that they are scheduled to move to Foote Homes, into a two-bedroom apartment. Ms. Williams was unable to testify as to when the move to Foote Homes would occur.

The DCS case worker, Ms. Miller, testified that this was not a stable home environment for the children. Ms. Miller's conclusion was based upon problems that had allegedly arisen between Teresa Williams and her grandchild, T.S.C., when T.S.C. was placed with Teresa Williams for an extended visit beginning in March 2000. Although Ms. Miller does not cite specific facts to support her conclusion, she states generally that "[t]he grandmother and [T.S.C.] did not have a great bond with each other. [The grandmother] was not a good influence on [T.S.C.] as being a placement source for [T.S.C.]."

Ms. Williams testified that her mother is a manic depressive and that she [Teresa Williams] suffers from asthma and bronchitis. She further testified that DCS has not provided any assistance

to her in terms of housing. When asked when she would be in a position to bring her children home, Ms. Williams responded that she would be ready "when I have my own apartment."

In terms of a support group, Ms. Williams testified that she does not have much contact with her extended family but that she does have support through Freedom Road. She also maintains contact with her sister-in-law, Rosetta Watkins.

At the time of the hearing, Ms. Williams was employed at St. Francis Hospital. Prior to that time, she had been working through temporary agencies. Ms. Williams described her job as "hospitality attendant." At the time of the hearing, her hours were from 12:30 p.m. until 8:00 p.m. Ms. Williams did indicate that there was a possibility that she could obtain another shift.

Ms. Williams has no vehicle and relies on public transportation to get to and from her job. According to her testimony, it takes an hour and a half by bus to get to work.

When asked on direct examination whether she had ever hurt C.B.W. by hitting him, Ms. Williams responded "Yes, I probably did, because I was very dis–I was irritable and discontent and up under [sic] the influence of drugs and alcohol." On cross-examination, the following testimony occurred:

> Q: After you completed those 1998 parenting classes, you still resorted to beating your children when you were frustrated. Isn't that true.
>
> A: [by Ms. Williams] I don't recall beating them. I did whip [T.S.C.], if you're referring about [sic] the scar on [T.S.C.'s] eye, you know.
>
> THE COURT: Well, the testimony you gave in court at that time was that [C.B.W.] fell down some stairs and [was] hurt. Right?
>
> THE WITNESS: [C.B.W.] did fall. [C.B.W.] did fall that day before. Yes, [C.B.W.] did.
>
> THE COURT: And that was the cause of the head injuries.
>
> THE WITNESS: I don't know anything about any head injuries.
>
> THE COURT: The testimony of the children to the case workers was that you kicked [C.B.W.] in the head with your feet.
>
> THE WITNESS: Say what now?
>
> THE COURT: That you kicked your child in the head.

THE WITNESS: Says who?

THE COURT: Says the kids that watched you do it.

THE WITNESS: No, I didn't do that, your Honor.

THE COURT: How did [C.B.W.] get two black eyes?

THE WITNESS: With my hand. I did hit them, because that particular morning I was, had just come down off of using drugs and alcohol and I was very irritable and discontent and I was so frustrated trying to get them ready for school that morning, rushing and everything. And my bathroom is like in the hall, and I was getting [C.B.W.] ready and [C.B.W.] was laying [sic] on the floor, which made me–I was standing over [C.B.W.], right at the bathroom. I was changing [C.B.W.'s] diaper. But no, I did not kick [C.B.W.]

THE COURT: So if the kids' memory is that you kicked [C.B.W.], the kids are lying or mistaken?

THE WITNESS: Mistaken.

THE COURT: And putting a pillow over one of the children's heads and saying I'm going to suffocate you, you didn't do that?

THE WITNESS: Which one of the children? Which one of them?

THE COURT: I don't remember which one.

THE WITNESS: I don't remember doing nothing [sic] like that, Your Honor.

THE COURT: The spoon incident where you shoved the spoon down the throat, there's nothing to that?

THE WITNESS: No.

THE COURT: Okay. What else was there that one of the kids said?

MS. HARDAWAY: holding the child under water, Your Honor.

THE COURT: Putting the child, holding [the child's] head under water.

-11-

THE WITNESS: I recall [C.B.W.] and [T.K.C. and T.J.C.] taking a bath together, and I recall [T.K.C. and T.J.C.] was putting [sic] their head up under [sic] the water and stuff, you know, playing, but no actually trying to put [C.B.W.'s] head up under [sic] water, no.

&ast;     &ast;     &ast;

Q: [by Ms. Hardaway] Well, you [Ms. Williams] gave [either T.K.C. or T.J.C.] a black eye before we [DCS] took [C.B.W.]; isn't that correct.
A: No, I didn't. No, I didn't.

An Order Terminating Parental Rights was entered on November 13, 2001, which reads in pertinent part as follows[12]:

FINDINGS OF FACT

On May 22, 1998 the above children, excluding [T.S.W.] who was unborn, were found to be dependent and neglected in that the mother was a substance abuser (marijuana, crack cocaine and alcohol), and the oldest child, [T.S.C.], had been physically abused and was sporadic in her school attendance. Upon recommendation of the department of children's services custody was awarded to a maternal uncle, Mr. James Eangelo Williams. By June 4, 1998, Mr. Williams indicated that he was unable to care for the children and they came into State custody.

On May 21, 1999 the mother petitioned for a return of custody in that she had completed parenting classes and a drug rehabilitation program. Upon recommendation of the Department of Children's Services, the children were returned to her custody under their protective supervision.

On March 1, 2000 the Department of Children's Services petitioned to remove all five children from the mother's care based upon new allegations of physical abuse. [C.B.W.] had two black eyes, and a hemorrhage in the right eye and the other children stated that the mother had strangled and hit him because he would not get dressed. The children were ordered back into the state's custody April 14,

---

[12] The November 13, 2001 Order was subsequently corrected on April 18, 2002 to dismiss the petition of Rosetta Watkins filed October 5, 2001.

2000. Not stated it the order of that date was a finding that the mother was again using drugs.

During this entire period of time the father of [T.J.C. and T.K.C.] and [T.S.C.] was incarcerated. On September 29, 1993 he was found guilty of Aggravated Assault, Tennessee Code Annotated, Section 39-13-102 and sentenced to the workhouse for 6 years. At some point he was released on probation and his probation was revoked April 28, 1998 having been convicted of a new charge of aggravated assault for which he received a new sentence of 8 years. At this time he is still incarcerated.

Mr. Crawford testified by telephone with all parties present. He testified that he and Ms. Williams (the mother of the above children; also known as Tonza Crawford) were married sometime in 1993. He testified that he and Ms. Williams lived together off and on and that for the 7 or 8 months preceding his latest jailing, roughly February 3, 1998, they lived apart. He never knew Ms. Williams to use any illegal drugs (despite her testimony that she used $100 a day on crack cocaine, a daily nickel bag of marijuana, and a quart of beer) and believed her to be a good mother. He had no knowledge of Ms. Williams' receipt of food stamps or any welfare benefits. While separated his family support was limited to bringing her pampers from time to time, and "whatever she needed." Initially he forgot his oldest child and testified only as to his knowledge of the twins. Moreover, during his incarceration he has not communicated with any of the children, or Ms. Williams, although he stays in touch with his sister. He did state that he had written letters to Ms. Williams which were not returned to him by the mail but Ms. Williams does not confirm receipt of any communication.

Respondents, Mr. Barry Williams, Mr. Rudolph Cooper, and any unknown fathers of said children, after being duly notified, failed to appear to make a defense to the petition to terminate their parental rights within the time required by law. A motion for default judgment against these respondents was made.

Respondents, Barry Williams and Rudolph Cooper, and any unknown fathers of said children, have for a period of four (4) consecutive months immediately preceding the filing of this Petition, abandoned said children in that they have willfully failed to visit the children and have made no reasonable effort to provide a suitable home and have demonstrated a lack of concern for the children to such a degree that

it appears unlikely that they will be able to provide a suitable home for the children at an early date.

Respondents, Barry Williams and Rudolph Cooper, and any unknown fathers of said children, failed, without good cause or excuse, to pay a reasonable share of prenatal, natal and postnatal expenses and support, failed to seek reasonable visitation, failed to manifest an ability and willingness to assume legal and physical custody of the children and furthermore failed to file a petition to legitimate the children, within thirty days after notice of alleged paternity.

Placing the children in Respondents, Barry Williams and Rudolph Cooper, and any unknown fathers of said children, legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children.

Ms. Williams testified that for 22 years she used $100 per day for her cocaine habit; that for 16 years she daily used a nickel bag of marijuana; and that for 11 years she daily consumed a quart of beer. She admits that from June 28, 2000 to December 21, 2000 she made no effort to communicate with or visit her children. She requested a visit December 22, 2000 which was accomplished January 11, 2001. Thereafter she requested the following visits which were arranged by Department of Children Services for 2 hour periods.

| Date | Result |
| --- | --- |
| January 11, 2001 | Ok |
| February 8, 2001 | Ok, but mother an hour late |
| February 22, 2001 | Cancelled by Department Of Children's Services |
| March 21, 2001 | Ok |
| April, 2001 | Ok |
| May 24, 2001 | Cancelled by the mother |
| May 30, 2001 | Cancelled by the mother |
| June 14, 2001 | Ok |
| June 21, 2001 | Missed due to mother's Incarceration |
| July 6, 2001 | Ok |
| July 12, 2001 | Ok |
| July 17, 2001 | Ok |
| August 31, 2001 | Ok |
| September 7, 2001 | Ok |

| September 14, 2001 | Ok |
| September 28, 2001 | Cancelled by the mother |

She acknowledges that her children were abused in her care, but states that the abuse was caused solely by her abuse of drugs. She denies the reports of the children that she put [C.B.W.] under the water to try to kill him, that she held a pillow over [T.S.C.'s] face to smother her, that she tried to choke a child by putting a spoon down his throat, and that she used to lock [T.K.C.] in a closet.

Ms. Williams testified that Mr. Hugh Crawford is the father of [T.K.C. and T.J.C.] and [T.S.C.]. She believes that the father of [C.B.W.] is Mr. Rudolph Cooper and that the father of [T.S.W.] is Mr. Barry Cox, but that, due to her use of drugs, she is not positive who may be their fathers.

Ms. Williams states that she and Mr. Crawford were married in 1993 and that they were never separated, his testimony to the contrary notwithstanding, and that they lived together every day until he was incarcerated in 1998. She has no recollection of his convictions in 1993 or earlier problems in 1984 and has not heard from him since 1998.

Sometime in December 2000, Ms. Williams decided to get drugs out of her life and enrolled in a Memphis Alcohol and Drug Council, Inc., "90 meetings in 90 days" program, beginning December 25, 2000, to become drug free. She tendered proof of her compliance with the drug program which shows that, her testimony to the contrary notwithstanding, she failed to attend meetings on January 1, 2, 5, 8, 13, 14, 17, 21, and 26, 2001. Additionally, she missed attendance in December and February and March. She states that she went to the Midtown Mental Health Center August 2001, for an evaluation and that she has failed to follow any of their recommendations. Her mental health evaluation reports states:

> "34-year-old African-American female with signs and symptoms of a major depressive disorder, recurrent, moderate who requires medications to alleviate her symptoms. She also requires counseling. I will also recommend alcohol and drug counseling but I think she will decline it. Axis 1: major depressive disorder, recurrent, moderate. Polysubstance dependence in subjective remission eight months."

Recommended were drugs for the depression (which she refuses to take) psychotherapy (which she has not undertaken despite years of urging by the Department of Children's Services) and alcohol and drug counseling (which she has not accepted other than the voluntary AA program).

Ms. Williams reports that she obtained a full time job beginning October 13, 2001 and that she interviewed for the job September 21, 2001. She was unable to attend a visitation in May due to employment which did not continue. At no time has she held a job for more than a short period of time.

The Department of Children's Services Permanency Plan of March 22, 2000 which was explained to and acknowledged by the mother, set as goals that the mother would participate in and complete an evaluation at the Le Bonheur Children's Medical Center, submit to random Drug screens and participate in recommended counseling. To date Ms. Willaims has failed to submit to any of these goals.

From June 28, 2000 to January, 2001 the children did not see or hear from their mother. [T.S.W.] and [C.B.W.] have no bond with their mother. The foster parent reports that when she first received [C.B.W.] he was afraid to be touched by anyone. [T.K.C. and T.J.C.] suffer from ADHD and after visits with their birth mother [T.K.C.] has acted out sexually with males and females and has acted out in the classroom and at home throwing temper tantrums. Both chldren continue to require regular counseling and medication.

It appears that during visits the mother makes inappropriate statements to the children which causes them to become disruptive in their foster placements and that contact with the mother causes the children emotional problems. The foster mother of [T.J.C. and T.K.C.] reports that the children know "two of our fathers are in jail." Further, she found [T.K.C.], who is afraid of the dark, hiding in the back of her closet one day. She asked why he was there and his brother responded that their mother used to lock him up in the closet.

The testimony before the Court is that the chldren, other than [T.S.C.], have thrived in the care of and have bonded with the foster parents each of whom state a desire to adopt the children in their care. [T.S.C.], on the other hand, has disrupted every foster care placement and appears to be in need of intensive psychological counseling from a Ph.D. or MD level professional. The Department of Children's

Services has been aware of her needs but has failed to provide the required level of services for "financial" reasons. [T.S.C.] has been the direct recipient of abuse at the hands of her mother and has witnessed her siblings being abused. None the less, she is reported to have a strong desire to live with her mother.

CONCLUSIONS OF LAW

The Court having listened to the testimony presented on the witness stand, and by phone, and having examined the witnesses manner and demeanor, listed to what they said and how they said it, finds by clear and convincing evidence as follows:

1. This Court has jurisdiction over this proceeding pursuant to TCA §§36-1-113(a) and 37-1-104.

2. Respondents, Mr. Barry Williams, Mr. Rudolph Cooper, and any unknown fathers of said children, have abandoned the children as defined in TCA §§36-1-113(g)(1) and 36-1-102(1)(A).

3. Respondents failed to manifest a willingness and ability to assume responsibility for said children in accordance with TCA § 36-1-113(g)(8)(A).

4. In accordance with TCA § 36-1-113(c)(2), the termination of the Respondents' parental rights is in the best interest of said children.

5. In accordance with TCA § 36-1-113(c)(1), there is clear and convincing evidence to support the termination of the Respondents' parental rights regarding said children.

6. Any finding of fact which should be deemed a conclusion of law is hereby adopted as such.

7. That Mr. Hugh Crawford effectively abandoned his children for the seven months immediately prior to his present incarceration. He provided at best only token support and had no meaningful contact or relationship with any of the children exercising, at best, only token visitation, within the meaning of Tennessee Code Annotated, Section 36-1-102 (1)(A)(iv). Further, Mr. Crawford engaged in conduct prior to his incarceration which exhibited a wanton disregard for the welfare of his children.

-17-

8. That Mr. Hugh Crawford's entire course of conduct of neglect, failure to support his family and repeated acts of violence and criminal conduct support a finding of abandonment in that his criminal behavior was reasonably calculated to result in incarceration, violation of the terms of his probation, and loss of his ability to parent any of the above children.

9. That as of December 21, 2000, Ms. Tonza Williams, effectively abandoned her children within the meaning of Tennessee Code Annotated, Section 36-1-102(1)(A)(ii) and (ii) [sic]. The Department of Children's Services, on the other hand, delayed filing a petition for termination until February 22, 2001 by which time Ms. Williams had exercised 2 visits; one on January 11, 2001 for two hours and one on February 8, 2001 for a little more than one hour. It thus cannot be said that she "failed to visit" in the "four months immediately preceding the filing of the petition to terminate parental rights." Given the court's inability to find the lapse of 60 days as falling within the term "immediately preceding" the court cannot sustain a finding of abandonment as set forth in section (a)(A)(I) of the code.

10. That pursuant to Tennessee Code Annotated, Section 36-1-102 (1)(A)(ii) the court does find that the children have been removed from the home of the mother as the result of a petition filed in the juvenile court in which the children were found to be dependent and neglected children, as defined in § 37-1-102, and the children were placed in the custody of the Department of Children's Services and that the juvenile court finds that the department made reasonable efforts to prevent removal of the children and for a period of seventeen (17) months following the removal, the department has made reasonable efforts to assist the parent to establish a suitable home for the child, but that the mother has made no reasonable efforts to provide a suitable home and has demonstrated a lack of concern for the children to such a degree that it appears unlikely that she will be able to provide a suitable home for the child at an early date.

11. That, pursuant to Tennessee Code Annotated Section 36-1-113(g) the court finds that there has been substantial noncompliance by the mother with the statement of responsibilities in a permanency plan; and that the children have been removed from the home of the parents by order of a court for a period of more than six (6) months and; that the conditions which led to the children's removal in all reasonable probability would cause the children to be subjected to further abuse or neglect and which, therefore, prevent the children's safe return to

the care of the mother still persist. Further, there is little likelihood that these conditions will be remedied at an early date so that the children can be safely returned to the mother or father in the near future. Additionally, the Court finds that the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home.

12. More specifically, the Court finds that the mother has failed to complete a psychological evaluation as required in the plan of care. She has gone to her own mental health professional and failed to follow the advice of that professional. She has failed to obtain and maintain steady employment and fails to understand the needs and interests of her children. She has failed to effect any lasting adjustment despite repeated efforts by the Department of Children's Services. She has failed to maintain anything other than token visitation. There exists no meaningful relationship between the children and their parents. Continued contact with the parents is detrimental to the physical, emotional and psychological health of the children. The mental status of the mother, together with her years of drug abuse and refusal to accept professional help, and her depression prevent her from effectively providing a safe and stable home, care and supervision for these 5 children.

13. That pursuant to Tennessee Code Annotated, Section 37-1-102 (b)(21)(B), the court finds that the mother knowingly exposed [C.B.W.] to severe abuse in that he had two black eyes and a hemorrhage in the right eye. Further, testimony revealed that [C.B.W.] was held under the water by his mother and he now has a recurring fear of water.

14. That termination of parental rights in this case is clearly in the best interest of each and all the children.

15. Respondent, Mr. Hugh Crawford, has abandoned the children as defined in TCA § § 36-1-113(g)(1) and 36-1-102(1)(A)(iv).

Hugh Crawford filed notice of appeal on November 26, 2001. By Motion, Mr. Crawford's counsel was allowed to withdraw effective March 22, 2002. Mr. Crawford then filed a motion for extension of time to file a statement of evidence, which motion was subsequently granted on April 15, 2002. On May 13, 2002, Mr. Crawford filed a Declaration of the Issues Appellant Intends to Present on Appeal; however, Mr. Crawford has not filed a brief nor made an appearance before this Court. Tonza Williams filed a Notice of Appeal on December 6, 2001 and, as stated in her brief, presents the following issues for our review:

**Issue 1**

Did the trial court violate due process by allowing the amendment of the Petition for Termination of Parental Rights to include "severe child abuse" the morning of the hearing and then finding "severe child abuse" by clear and convincing evidence

A. Did the Trial Court err in allowing the Petition for the termination of parental rights to be amended the morning of the hearing to include an allegation of "severe child abuse?

B. Did the trial court err in finding severe child abuse at the termination hearing when the issue was adjudicated in an earlier hearing as dependency and neglect?

C. Did the trial court correctly apply the statutory definition of "severe child abuse?

**Issue 2**

Did the Court err when it ruled that non disclosed documents in the State's control were not relevant or were privileged although these materials were a part of the case manager's [file ?]

A. Is the requirement for discovery of documents in the possession of DCS relevancy [sic]?

B. Is everything a DCS attorney says in DCS meetings (even when attended by third parties) and recorded by the caseworker in the case file privileged by the attorney client privilege?

**Issue 3**

Did the Court base its findings on clear and convincing evidence?

A. Did the trial court err in not considering any of the mother's progress and the actions taken by the mother after the date of the filing of the original petition for termination in this case?

B. Did the Mother substantially meet the requirements of the various permanency plans presented to her by DCS?

C. Are the findings by the court based on clear and convincing evidence with each and every necessary element proved by the state?

D. Was a proper best interest of the children determination made in this case?

Since this case was tried by a trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

We will first address Issue 2. On September 7, 2001, counsel for Ms. Williams filed a request for discovery that was approved by the trial court. Although the case manager's records were made available to Ms. Williams' counsel, certain portions were redacted and other items were not produced. On the morning of the October 11, 2001 hearing , Judge Horne made an *in camera* inspection of the documents that were redacted and/or not produced. Following his inspection, the following transpired:

> THE COURT: I went over each of the documents that was attached that supposedly are what hadn't been provided, and they were all communications provided by Ms. Hardaway directing staff what to do to prepare for the trial, and they were all documents within the past, I guess, about two months. They would clearly fall within the category of attorney/client privilege.
>
> In addition to that, they would be irrelevant, because the issue here is the termination as of February, if I understand it, and it's not what has happened since February, it's what's happened prior to February.

The trial court is afforded wide discretion in the admission or rejection of evidence, and the trial court's action will be reversed on appeal only when there is a showing of an abuse of discretion. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439 (Tenn. 1992); *Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995). From our review of the record, and in light of the wide latitude given the trial courts determination to admit or exclude evidence, Ms. Williams has failed to show an abuse of discretion by the trial court. Therefore, we find no reversible error by the trial court in its evidentiary ruling on these documents.

We now turn our discussion to Issue 3 and, because we find that there is clear and convincing evidence to terminate Ms. Williams' parental rights on grounds other than severe child abuse, we pretermit discussion of Issue 1.

The February 22, 2001 Petition for Termination of Parental Rights reads in pertinent part as follows:

14.A. Pursuant to T.C.A. § 36-1-113(g)(1) and as defined in T.C.A. §§ 36-1-102 (1)(A)(i)(ii)(Supp. 1994) and 36-1-102 (1)(B)(ii)(Supp. 1994), Petitioners further assert that Respondents have for a period of four (4) consecutive months immediately preceding the filing of this Petition, abandoned the children in that they have willfully failed to visit the children and willfully failed to pay support for said children.

B. The children have been removed from the home of Respondent, Tonza [Williams] Crawford, as a result of a petition filed in this Court in which the children were found to be dependent and neglected children as defined in T.C.A. § 37-1-102... for a period of four (4) months following the removal, the State of Tennessee Department of Children's Services made reasonable efforts to assist Respondent, Tonza [Williams] Crawford, to establish a suitable home for the children, but Respondent, Tonza [Williams] Crawford, has made no reasonable efforts to provide a suitable home and has demonstrated a lack of concern for the children to such a degree that it appears unlikely that she will be able to provide a suitable home for the children at an early date.

15. Petitioners assert that pursuant to T.C.A. §§ 36-1-113(g)(2) and 37-2-403, Respondent, Tonza [Williams] Crawford, has substantially failed to comply with the statement of responsibilities contained in the Permanency Plans of the minor children, said documents being attached hereto as Exhibit No. 4.[13]

16. Petitioners assert pursuant to T.C.A. § 36-1-113(g)(3)(A), that the minor children have been removed from the custody of Respondent, Tonza Crawford, by the court for at least six (6) months and:

A. The conditions which led to the children's removal or the conditions which in all probability would cause the children to be subjected to further abuse or neglect and which, therefore, prevent the children's return to the care of Respondent, Tonza Crawford still persist;

---

[13] In our review of the record, we do not find Exhibit No. 4 attached to the Petition. We note, however, that, since the Plans were revised as of January 18, 2001, this is the set of Plans that we will assume Petitioners are referring to and not those Plans initially established in March of 2000.

B. There is little likelihood that these conditions will be remedied at an early date so that the children can be returned to Respondent, Tonza Crawford; and

C. The continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a stable and permanent home.

\*      \*      \*

18.A. In accordance with T.C.A. §§ 36-1-113(d)(3)(C) and 37-1-147, Petitioners further assert that termination of Respondents' parental rights is in the best interest of the minor children...

We further note that clear and convincing evidence of any one of the above grounds is sufficient to terminate Ms. Millers' parental rights. *See* T.C.A. § 36-1-113(g). Having reviewed the entire record in this matter, we note that Ms. Williams' has taken some substantial strides since January 2001 to get the help she needs in order to overcome her addiction to drugs and alcohol and to comply with the Plans. However, we must look at the totality of the circumstances in this matter and that requires us to also consider Ms. Williams' compliance with the Plans from March 2000 until December 2000. The record clearly reflects the fact that Ms. Williams failed in her initial attempt to comply with the Plans. The efforts made from January 2001 until the October 2001 hearing were honorable; however, we view these efforts with some degree of scepticism based upon Ms. Williams' propensity for recidivism. Ms. Williams' children were initially removed to State custody on May 22, 1998. Despite the fact that she regained custody on May 21, 1999, Ms. Williams failed to apply any parenting or anger management skills she may have procured while attending parenting classes during the period that the children were out of her custody. Consequently, the children were again removed to State custody on March 1, 2000. While the record reflects that Ms. Williams began visitation with her children under the March 22, 2000 Plans, from July of 2000 until December 22, 2000, she made no efforts to contact her children or to take the steps necessary to regain custody. The fact that Ms. Williams has had these setbacks means that substantial compliance with the Plans, at this point, would require more than just going through the classes and counseling. Based upon her propensity for recidivism, substantial compliance would require proof that she is now able to apply those parenting skills in the stressful context of day-to-day life with five active children. It would require proof that she is able to maintain sobriety for a substantial period of time. When questioned about her ability to maintain a job, housing, and her sobriety without resorting to old behavior patterns of abuse, Ms. Williams testified as follows:

> Q: Did you [Ms. Williams] hear [the testimony] this morning about the entire picture, that you needed to have a job, you needed to have a home, in addition to just being clean as far as drug screens were concerned in order to have some success at making it this time staying sober?

A: Uh-huh.

Q: Not abusing your children again?

A: Uh-huh.

*                              *                              *

Q: But you would agree that you have hopped jobs several times since these children have been in care? I mean they have only been in care since March 2000 and you are on at least your third job now.

A: Well, the purpose of me leaving Hershey's, it wasn't stable and it wasn't dependable. You know where I am at now, it's more stable and dependable.

Q: But you refused? When they called you back, you then refused?

A: Yes, I did, and I explained why I refused. You know, they–I kept going in for about a week and they kept, you know, turning me around and I wasn't making any money...

*                              *                              *

Q: And you are attending AA meetings; is that correct?

A: Yes.

Q: Now, how many AA meetings do you go to in a week?

A: All day, you know, when I wasn't working. When I wasn't working, I was at meetings all day.

*                              *                              *

THE COURT: What are you going to do when you have five children added to that?

THE WITNESS: Huh?

THE COURT: What are you going to do when you have five children added to that?

-24-

THE WITNESS: I will have to make time.

THE COURT: For the children or for the meetings?

THE WITNESS: For the meetings and for the children because they can come to the meetings with me.

THE COURT: So the children are to attend the AA meetings with you?

THE WITNESS: Yes.

*                                    *                                    *

Q: (By Ms. Hardaway) You [Ms. Williams] missed your last two visits with the children because you had to work; right?

A: Yes.

Q: So right now the stresses are just too much for you to balance more than one thing at a time. Would you agree?

A: No, it can be worked out. Things can be worked out to balance.

Q: And it's still your testimony that it would just be three months from where you are right now until you could get your children and we could be assured that you would keep them and we wouldn't have to come back and get them again?

A: Right.

Although Ms. Williams has good intentions, it is her testimony that she is currently unable to balance all of the demands of her life. And while she may have good intentions to make time for everything and to strike a balance among her obligations, there is simply no clear and convincing evidence in the record that she would be able to do so.

Additionally, Ms. Williams has been unable to procure adequate housing for her children. At the time of the hearing, Ms. Williams was living in a one-bedroom apartment with her mother. The mother was suffering from manic-depression and other physical maladies. When asked about her plans for obtaining adequate housing for herself and five children, Ms. Williams testified as follows:

> Q: ...And you're [Ms. Williams] planning to get a two bedroom apartment; correct?
>
> A: Yes, ma'am.
>
> Q: And do you imagine–will there be any problem–I honestly don't know. Will there be any problem with the landlord with five children? Do you plan to get your own place or what?
>
> A: Yes.
>
> Q: You plan to get your own place?
>
> A: Yes, I do plan on getting my own place. If my children should come into my custody right now, by me being on the lease they will give me an apartment because we [Ms. Williams and her mother] are in public housing.
>
> Q: So public housing will give you an apartment?
>
> A: Yes. You know, if I–if my children come back to my custody, by me being already on the lease, quite naturally they will give me a bigger apartment.

Again, there are good intentions on the part of Ms. Williams; however, there is nothing else in the record to indicate that public housing is available or that Ms. Williams, by herself, has qualified for a two-bedroom unit.

For the foregoing reasons, and pursuant to T.C.A. § 36-1-113(g), we find that these children have been removed from the home of the parents for a period of more than six (6) months. Furthermore, the conditions which led to the children's removal still persists and, therefore, prevent these children's safe return to their mother's care. There is also little likelihood that these conditions will be remedied at an early date so that the children can be safely returned to the mother in the near future. Consequently, we find that the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable, and permanent home.

There is clear and convincing evidence that termination of parental rights is in the best interest of each of these children. We, therefore, affirm the Order of the juvenile court, terminating the parental rights of Ms. Tonza (Crawford) Williams, Mr. Barry Williams, Mr. Rudolph Cooper, Mr. Hugh Crawford, and any other unknown fathers. Costs of this appeal are assessed to the Appellant, Ms. Tonza Williams, and her surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.